[No. B100097. Second Dist., Div. Four. May 4, 2000.]

OLD REPUBLIC INSURANCE COMPANY, Cross-complainant, Cross-defendant and Appellant, v.
FSR BROKERAGE, INC., Cross-defendant, Cross-complainant and Respondent.

**COUNSEL**

Arter & Hadden, Jacqueline I. Valenzuela; Owen & Post and J. Douglas Post for Cross-complainant, Cross-defendant and Appellant.

Callahan & Blaine, Jim P. Mahacek, Nicki N. Eke; Gascou, Gemmill & Thornton, Bruce M. Thornton and Carlos V. Yguico for Cross-defendant, Cross-complainant and Respondent.

**OPINION**

**CURRY, J.**—Following a bench trial, the trial court concluded that appellant Old Republic Insurance Company (hereafter Old Republic) had not secured a right of reimbursement against respondent FSR Brokerage, Inc., doing business as Fred Sands Realtors (hereafter FSR). Subsequently, a jury found that Old Republic had engaged in bad faith by asserting a claim for fraud against FSR. We reverse the trial court's ruling on Old Republic's right of reimbursement, reverse the judgment on FSR's bad faith claim, and remand for further proceedings. In so ruling, we conclude that a bad faith

claim against an insurer for initiating litigation against the insured fails as a matter of law when the insured does not contend that the insurer acted unreasonably in investigating or paying the underlying insurance claim.

## FACTUAL BACKGROUND

FSR, a corporation engaged in the real estate brokerage business, bought errors and omissions indemnity policies from Old Republic from 1985 to 1992. The pertinent policies had a $100,000 deductible, and provided that Old Republic would indemnify "the Insured" for losses in excess of the deductible arising from claims "first made against the Insured during the policy period" and reported in accordance with the policies.

The policies defined "Insured" to include FSR, as well as "any partner, officer, director or employee of [FSR] . . . ." With respect to independent contractors, the policy provided coverage only to "the Insured[] . . . for loss arising from the acts, errors or omissions of independent contractors in the performance of real estate services for which the Insured is legally liable," and "for the liability of the Insured to indemnify independent contractors for loss where such liability arises out of the rendering or failure to render real estate services by such independent contractors."

In 1986, FSR started its own errors and omissions program to protect FSR's sales agents in the event of lawsuits arising out of real estate transactions.

During the pertinent period, Larry Cannizzaro was an FSR real estate sales agent who also worked as an assistant manager in an FSR office. In July 1987, Gerald Busch filed an action against FSR, Cannizzaro, and several other persons associated with FSR. Busch's complaint alleged that Edward Forgy had listed an investment property on Ellendale Place with FSR, and that Cannizzaro had improperly prevented Busch from purchasing the Ellendale property so that he could buy it himself. In June 1991, Old Republic paid $250,000 to settle the Busch action.

In July 1991, Forgy filed a suit against Cannizzaro and FSR arising from the Ellendale property transaction. Old Republic paid $15,000 to settle this action.

In August 1991, Gold, Marks, Ring & Pepper (Gold, Marks), a law firm, sued Cannizzaro for nonpayment of attorney fees incurred during the Busch action. Old Republic paid $71,369.20 to settle this action.

### Relevant Procedural History

On August 7, 1992, Cannizzaro filed a complaint against Old Republic and FSR, alleging breach of contract, bad faith, and numerous other claims. On September 24, 1992, Old Republic filed a cross-complaint against Cannizzaro and FSR, seeking subrogation and indemnity.

On October 20, 1993, Cannizzaro filed a second amended complaint against Old Republic, FSR, and Chicago Underwriting Group, Inc., (hereafter CUG) containing claims for breach of contract, bad faith, fraud, intentional infliction of emotional distress, express contractual indemnity, and negligence. The second amended complaint alleged that Cannizzaro had sold real estate in association with FSR, and that he was entitled to coverage for claims against him arising from his sales activities under policies issued by FSR and by Old Republic. The second amended complaint further alleged that FSR, Old Republic, and CUG, Old Republic's agent, had failed, inter alia, to pay his defense costs.

On January 24, 1994, FSR filed a cross-complaint against Old Republic for breach of contract and bad faith.

On February 18, 1994, Old Republic filed a motion for summary judgment or adjudication on Cannizzaro's second amended complaint. Old Republic argued, among other things, that Cannizzaro was not an insured under the policy that it had issued to FSR because Cannizzaro was an independent contractor and not an employee of FSR. On or about April 26, 1994, the trial court granted summary judgment in Old Republic's favor, concluding, inter alia, that Cannizzaro was neither an insured nor third party beneficiary under the Old Republic policies.

On June 28, 1994, Old Republic filed a second amended cross-complaint against Cannizzaro and FSR. The second amended cross-complaint sought subrogation, indemnity, and declaratory relief against both cross-defendants, alleging that Old Republic had funded settlements or paid legal fees in three actions involving Cannizzaro to protect FSR, and that it was entitled to recover these sums from Cannizzaro and FSR. In addition, the second amended cross-complaint asserted claims of fraud, breach of contract, and bad faith against FSR, alleging that FSR had (1) intentionally failed to disclose Cannizzaro's true status as an independent contractor to Old Republic to ensure that Old Republic would pay defense and settlement costs in the Busch, Forgy, and Gold, Marks actions, and (2) submitted false invoices to Old Republic regarding defense expenses.

On September 1, 1994, the trial court granted FSR's petition to compel contractual arbitration of its disputes with Cannizzaro. The arbitrator issued

an award in Cannizzaro's favor in the first phase of the arbitration, concluding that FSR had breached its duties to Cannizzaro under the FSR errors and omissions program, and that FSR's conduct rose to bad faith.

On October 27, 1994, the trial court granted FSR leave to file a first amended cross-complaint on December 5, 1994. On January 13, 1995, the trial court ordered one of FSR's claims stricken, leaving FSR with claims for breach of contract, declaratory relief, and bad faith.

On February 27, 1995, the trial court bifurcated trial on Old Republic's and FSR's cross-complaints. Following a bench trial, the trial court found on March 2, 1995, that Old Republic had not adequately reserved its rights to reimbursement from Cannizzaro and FSR. The trial court indicated that this finding barred any relief on Old Republic's second amended cross-complaint, with the possible exception of Old Republic's claim that it had overpaid FSR due to the submission of false invoices. It decided to conduct a jury trial on FSR's claims against Old Republic, and then impanel a jury, if necessary, to determine any unresolved claims by Old Republic against FSR.[1]

The first jury trial on FSR's claims against Old Republic ended in a mistrial on March 27, 1995. During the second jury trial, FSR elected to pursue a single bad faith claim against Old Republic. On August 9, 1995, the jury found that Old Republic had acted in bad faith, but not with malice, oppression, or fraud.

On December 27, 1995, judgment was entered in FSR's and Old Republic's cross-complaints. The judgment awarded FSR $210,000 in damages pursuant to a stipulation that FSR and Old Republic had entered into during the first jury trial. This award was subject to an offset regarding Old Republic's claim against FSR concerning false invoices for defense expenses. The parties entered into a stipulation regarding the offset for this claim. On February 7, 1996, Old Republic filed a notice of appeal from this judgment.

---

[1]On July 5, 1995, judgment was entered on the claims between Old Republic and Cannizzaro, and both parties appealed. In an unpublished opinion (*Cannizzaro v. Old Republic Insurance Co.* (Dec. 22, 1997, B092175)), we reversed the summary judgment in Old Republic's favor on Cannizzaro's second amended complaint with respect to his claims for breach of contract and bad faith, concluding that there were triable issues of fact as to whether he was FSR's employee. In addition, we reversed the judgment in Cannizzaro's favor on Old Republic's second amended complaint, reasoning that the trial court's finding that Old Republic had not secured a right of reimbursement from Cannizzaro failed for want of substantial evidence.

DISCUSSION

I.

With respect to the bench trial on Old Republic's right to reimbursement, Old Republic contends that the trial court (1) erred in concluding that Old Republic had not secured a right to reimbursement, and (2) improperly denied Old Republic a jury trial on factual issues concerning whether Old Republic had waived its right to reimbursement. As we explain below, these issues are closely intertwined. For this reason, we recount the record on both issues at the same time.

### A. *Relevant Facts*

Old Republic requested a jury trial on its second amended cross-complaint and deposited jury fees. Thereafter, FSR sought by motion in limine to preclude Old Republic from presenting any evidence that it was entitled to reimbursement of funds paid to FSR. Citing *Reliance Ins. Co. v. Alan* (1990) 222 Cal.App.3d 702, 708-710 [272 Cal.Rptr. 65], *Insurance Co. of the West v. Haralambos Beverage Co.* (1987) 195 Cal.App.3d 1308, 1322-1323 [241 Cal.Rptr. 427], and *Travelers Ins. Co. v. Lesher* (1986) 187 Cal.App.3d 169, 203-204 [231 Cal.Rptr. 791], FSR contended that an insurer may recover funds only if there is an agreement in fact or understanding between an insurer and its insured concerning reimbursement. FSR argued that (1) Old Republic's initial reservation of rights did not establish the requisite agreement in fact or understanding, (2) it later expressly waived any right to reimbursement, and (3) it never subsequently obtained FSR's agreement to reimbursement. Old Republic opposed the motion, contending that no agreement in fact was required to secure the right to reimbursement.

Following argument on the motion, the trial court concluded that it would hold a bench trial on the "*Haralambos* issue," which it characterized as "a matter of law." At the outset of the bench trial, the following exchange occurred between Old Republic's counsel and the trial court:

"Ms. VALENZUELA: Your Honor, briefly before we begin, is this aspect of this trial to determine whether we adequately reserved our rights to reimbursement, or is waiver—or the possible waiver of that reservation of rights also—

"THE COURT: No. It's the adequacy of the agreement itself—

"Ms. VALENZUELA: Okay.

"THE COURT: —if there was an agreement, or the understanding."

Old Republic submitted evidence in its case-in-chief that in November 1990, FSR requested an advance of defense costs in the Busch action after it had exhausted the $100,000 retention, and later asked for settlement authority in the amount of $100,000. CUG, acting on behalf of Old Republic, responded with letters in November 1990 advising FSR that Old Republic was reserving its rights, including the right to recoup "any and all indemnity payments . . . ." On December 26, 1990, FSR's counsel wrote to Old Republic acknowledging this reservation. In early 1991, Old Republic and CUG made similar reservations in correspondence to FRS regarding the Busch action. Later, in connection with the Forgy action, Old Republic sent a letter to FSR dated May 11, 1992, authorizing a settlement while reasserting its prior reservations. There was also testimony that Old Republic had reminded FSR about its reservation of rights in connection with the settlement of the Gold, Marks action.

During Old Republic's case-in-chief, FSR's counsel sought to elicit testimony from Steven Elie, Old Republic's coverage counsel, regarding whether Old Republic had waived any right to reimbursement in March 1991, and whether Old Republic had later renewed its reservation of this right. The following exchange occurred: "Ms. VALENZUELA: . . . My understanding is that this series of questions is going to go into an alleged waiver by Old Republic, and I thought that was beyond the scope of this phase. I thought this phase was just whether we had reserved our rights. [¶] THE COURT: That's my understanding, too." Old Republic's counsel objected to the testimony and argued that waiver is "a factual issue and not a legal determination." The trial court nonetheless decided to hear the testimony.

The evidence that emerged at trial regarding waiver was in sharp conflict. Bruce Armstrong, who represented FSR in the Busch action, testified that in March 1991 he received written authority from Old Republic to pursue a settlement of the action, and that Old Republic agreed to waive its prior reservation of the right to reimbursement for the purposes of the settlement. He denied that Old Republic ever renewed its reservation of this right.

By contrast, Elie and Martin Perry (president of CUG) testified that the waiver in question was limited to a specific settlement proposal that was never consummated. Elie acknowledged that he never expressly informed Armstrong in writing that Old Republic was reasserting its right to reimbursement after the settlement proposal collapsed. However, on June 17, 1991, Elie sent a letter to Armstrong stating that Old Republic's reservations

of right were "still in full force and effect," and he testified that in June 1991, he told Armstrong at a meeting that any settlement in the Busch action was subject to a right of reimbursement.

During argument following the presentation of evidence, the trial court raised Old Republic's failure to reserve a right to reimbursement in its letter to Armstrong authorizing him to pursue a settlement. The following exchange occurred:

"Ms. VALENZUELA: As you will recall, when we first started getting into this issue of waiver, we objected, because we took the position it was beyond the scope of what we understood this limited phase was going to be, and that was whether there was an adequate reservation of rights. And we stated at that time that we thought that it was a factual issue and not a legal one as to whether—

"THE COURT: Well, I mean, I haven't heard anybody request a jury trial on this whole issue. And it came to my attention during the course and certainly to your attention by your brief, as of 4:30 yesterday that, perhaps, there was going to be an issue of credibility during the course of this trial. Now, nobody has asked for a jury trial this morning—even now—I haven't heard anything. You know, I just assumed that this is going to be a call by the court, if, in fact, it came down to that.

"Ms. VALENZUELA: Well, we thought we had adequately preserved our objection.

"THE COURT: No. I haven't heard anything. If that's what you're now requesting, I'll so note it. If you're requesting a jury trial on this issue.

"Ms. VALENZUELA: Yes, Your Honor."

Thereafter, the trial court found that in connection with the Busch action, Old Republic had failed to prove that an agreement or understanding with FSR about reimbursement existed after Old Republic waived its right to reimbursement in March 1991. The trial court also found that Old Republic had failed to demonstrate the requisite agreement in connection with the Forgy and Gold, Marks actions.

B.   *Right to Reimbursement*

Old Republic contends that the trial court erred in concluding that its reservation of a right to reimbursement from FSR was inadequate.

When a party lends or pays out money at the request of another, the law will imply a promise or obligation to repay the money stemming from the equitable principle of avoiding unjust enrichment. (*Moya v. Northrup* (1970) 10 Cal.App.3d 276, 280-281 [88 Cal.Rptr. 783]; *Rains v. Arnett* (1961) 189 Cal.App.2d 337, 344 [11 Cal.Rptr. 299].) In *Buss v. Superior Court* (1997) 16 Cal.4th 35 [65 Cal.Rptr.2d 366, 939 P.2d 766], our Supreme Court clarified the application of principles concerning "quasi-contractual" or implied-in-law obligations in the context of third party insurance.

In *Buss*, a multicount complaint was filed against the insured, who tendered defense of the action to his insurers. (*Buss v. Superior Court, supra,* 16 Cal.4th at pp. 40-41.) The pertinent insurer accepted the defense under a reservation of rights, contending that only one of the claims alleged in the complaint was potentially covered by the insurer's policy. (*Id.* at pp. 41-42.) The reservation of rights included the right to seek reimbursement for defense funds expended on claims for which there was no policy coverage. (*Id.* at p. 42.) The action was eventually settled without a settlement contribution from the insurer. (*Ibid.*)

The insurer then sought reimbursement for the defense funds it had expended with respect to the claims it contended were not potentially covered by the policy. (*Buss v. Superior Court, supra,* 16 Cal.4th at pp. 42-43.) Citing principles concerning unjust enrichment, the court in *Buss* concluded that third party insurers that reserve the right to reimbursement have a quasi-contractual right to recover defense costs arising from claims that are not potentially covered by the policy, but no similar right to recover defense costs arising from claims that are potentially covered. (*Id.* at pp. 49-52.)

The *Buss* court reasoned that under a standard third party policy, an insurer has a duty to indemnify the insured for sums that the insured becomes legally obligated to pay as damages for any covered claim, as well as the duty to defend potentially covered claims. (*Buss v. Superior Court, supra,* 16 Cal.4th at pp. 42-44.) Accordingly, insurers cannot recover defense costs incurred on potentially covered claims in quasi-contract because they have a contractual duty to pay these costs. (*Id.* at pp. 49-50.)

By contrast, insurers may recover defense costs incurred on claims not potentially covered in quasi-contract, provided they reserve the right to reimbursement. (*Buss v. Superior Court, supra,* 16 Cal.4th at pp. 50-51, 61, fn. 26.) The court in *Buss* explained: ". . . With regard to defense costs for these claims, the insurer has not been paid premiums by the insured. It did

not bargain to bear these costs. To attempt to shift them would not upset the arrangement. [Citation.] The insurer therefore has a right of reimbursement that is implied in law as quasi-contractual, whether or not it has one that is implied in fact in the policy as contractual." (*Id.* at p. 51, fn. omitted.) The *Buss* court thus disapproved the cases relied upon by FSR in its motion in limine. (*Id.* at p. 52, fn. 14.)

The case before us differs from *Buss* in two pertinent ways. First, the Old Republic policies at issue are not standard third party policies. Although the policies in question obligated Old Republic to indemnify FSR, one policy provides that Old Republic had no duty to assume FSR's defense or to advance defense or legal expenses, and the other policy provides that FSR was obligated to investigate and defend claims against it, and that Old Republic had no duty to "take over and conduct" FSR's defense. Second, Old Republic sought reimbursement for defense *and* settlement costs.

Despite these two differences, we conclude that *Buss* applies to the case before us. The reasoning in *Buss* implies that a third party insurer that reserves its right to reimbursement may seek reimbursement in quasi-contract for funds advanced or paid out that the insurer was not obligated to pay under the policy. An insurer may therefore recover settlement or defense funds that it had no contractual duty to pay provided it can establish that it reserved a right to reimbursement, and there is otherwise a proper basis for recovery in quasi-contract. (*Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 516-517 [78 Cal.Rptr.2d 142] [insurer entitled to reimbursement of settlement costs when it reserved its rights to recoupment of such costs and insureds demanded and agreed to settlement].)

Here, the trial court applied the rule rejected in *Buss* that Old Republic's right to reimbursement required an agreement in fact or understanding between Old Republic and FSR. However, we do not review the trial court's reasoning, and we will uphold the ruling if it is correct on any theory properly sustained by the record. (*Mayflower Ins. Co. v. Pellegrino* (1989) 212 Cal.App.3d 1326, 1332 [261 Cal.Rptr. 224].)

The contents of Old Republic's letters to FSR about reimbursement before March 1991 are undisputed, and under *Buss*, they establish that Old Republic *initially* secured a right to reimbursement regarding all funds paid out in connection with the Busch action, whether for defense or settlement.[2] (See *Downey Venture v. LMI Ins. Co., supra,* 66 Cal.App.4th at pp. 516-517.)

---

[2] FSR contends that Old Republic necessarily failed to prove that it initially secured this right because it did not submit the underlying insurance policies into evidence during the

Accordingly, the key question is whether the trial court properly determined that in March 1991, Old Republic waived or extinguished any preexisting right to reimbursement *in its entirety*, and subsequently failed to reassert this right.

### C.  *Denial of Jury Trial*

We therefore address whether, as Old Republic contends, the trial court improperly denied it a jury trial on the issue of waiver.

■   The term "waiver" is sometimes used indiscriminately to refer to the doctrine of waiver, and the distinct but similar doctrine of estoppel. (*DRG/ Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 59 [35 Cal.Rptr.2d 515].) "Waiver refers to the act, or the consequences of the act, of one side. Waiver is the intentional relinquishment of a known right after full knowledge of the facts and depends upon the intention of one party only. Waiver does not require any act or conduct by the other party." (*Ibid.*) Thus, "[t]he *pivotal* issue in a claim of waiver is the intention of the party who allegedly relinquished the known legal right." (*Id.* at p. 60, italics added.) " '[E]stoppel is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts. [Citations.]' " (*Id.* at p. 59.)

These distinctions between the two doctrines were reaffirmed in the insurance context in *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1 [44 Cal.Rptr.2d 370, 900 P.2d 619]. The court in *Waller* stated: "Case law is clear that ' "[w]aiver is the intentional relinquishment of a known right after knowledge of the facts." [Citations.] The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver" [citation].' [Citations.] The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right. [Citation.]" (*Id.* at p. 31.) Thus, " 'California courts will find waiver when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.' [Citation.]" (*Id.* at pp. 33-34, quoting *Intel Corp. v. Hartford Acc. & Indem. Co.* (9th Cir. 1991) 952 F.2d 1551, 1559.) The *Waller* court further observed that "in the insurance context the terms 'waiver' and 'estoppel' are sometimes used interchangeably, even though estoppel requires proof of the

bench trial. We disagree. The parties' remarks during the bench trial indicate that the existence of the insurance policies was undisputed and never at issue during the bench trial.

insured's detrimental reliance. [Citation.]" (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 33.)

" 'Whether there has been a waiver is usually regarded as a question of fact to be determined by the jury, or by the trial court if there is no jury.' [Citation.]" (*Posner v. Grunwald-Marx, Inc.* (1961) 56 Cal.2d 169, 189 [14 Cal.Rptr. 297, 363 P.2d 313].) By contrast, "[t]he estoppel issue is a nonjury fact question to be determined by the trial court in accordance with applicable law." (*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd., supra,* 30 Cal.App.4th at p. 61.) However, the trial court may properly resolve an issue of waiver as a question of law when the underlying facts are undisputed. (*Silva v. National American Life Ins. Co.* (1976) 58 Cal.App.3d 609, 615 [130 Cal.Rptr. 211].)

Here, Old Republic communicated its waiver to FSR in a March 1991 letter stating that "for purposes of this settlement," Old Republic agreed to waive its right to reimbursement. The evidence is in conflict regarding Old Republic's intentions in sending this letter and what the parties understood the letter to mean, especially regarding whether the phrase "this settlement" referred to a specific proposal that was rejected or to any settlement of the Busch action. Accordingly, the extent of Old Republic's waiver was not resolvable as a matter of law, and Old Republic could properly seek a jury trial on factual issues pertinent to the scope of the waiver.

Generally, when an action involves some issues that are properly tried to the court and other issues that are properly tried to a jury, a party seeking a jury trial need not specify the particular issues upon which it wants a jury trial in its demand. (See *Robinson v. Puls* (1946) 28 Cal.2d 664, 666-667 [171 P.2d 430].) Furthermore, section 631 of the Code of Civil Procedure specifies exclusive methods by which a jury trial may be waived, which fall into three categories: (a) failure to appear for trial, (b) express consent, and (c) noncompliance with statutory requirements. (7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 113, pp. 131-132; see *Cooks v. Superior Court* (1990) 224 Cal.App.3d 723, 727 [274 Cal.Rptr. 113].)

During the bench trial, Old Republic obtained clarification that the trial court would *not* determine the issue of waiver, promptly objected when the trial court began to hear evidence on the issue, and expressly demanded a jury trial when the trial court indicated it contemplated ruling on the matter. We discern nothing in the record indicating that Old Republic consented to a bench trial on the issue of waiver or otherwise gave up the

right to a jury trial on this issue.[3] (*City of Redondo Beach v. Kumnick* (1963) 216 Cal.App.2d 830, 835-837 [31 Cal.Rptr. 367].)

FSR contends otherwise, citing *Escamilla v. California Ins. Guarantee Assn.* (1983) 150 Cal.App.3d 53 [197 Cal.Rptr. 463]. However, *Escamilla* is factually distinguishable. In *Escamilla*, all of the parties to the action requested a jury trial, and the court incorrectly determined they were not entitled to a jury trial on a specific issue. (150 Cal.App.3d at pp. 57-59.) Only one of the parties objected to this ruling. (*Id.* at p. 59) After the bench trial ended in a verdict unfavorable to some of the nonobjecting parties, they renewed their demand for a jury trial in a motion for a new trial. (*Ibid.*) The court in *Escamilla* concluded that these parties had waived their right to a jury trial by their failure to object and their silence on the issue throughout the bench trial. (*Id.* at pp. 61-64.) Here, unlike *Escamilla*, Old Republic agreed to a limited bench trial, objected to evidence outside these limits, and demanded a jury trial when the trial court indicated that it would rule on issues outside these limits.

In sum, the trial court improperly denied Old Republic a jury trial on the issue of waiver.

### D.  *Conclusion*

As we have explained, the trial court's rulings on Old Republic's right of reimbursement cannot be affirmed absent a determination that Old Republic entirely extinguished its initial right of reimbursement in some manner. (See pt. I.A., *ante.*) Because the trial court improperly denied Old Republic a jury trial on whether it waived this right in its entirety in March 1991, the trial court's rulings cannot be affirmed on a theory of waiver.

Nor can these rulings be affirmed on a theory of estoppel. Estoppel was not litigated during the bench trial, and the focus of the evidence was solely on Old Republic's intent in extending the March 1991 waiver and FSR's understanding of Old Republic's waiver. Whether FSR relied on some representation from Old Republic that it would never seek reimbursement

---

[3]In denying Old Republic's request for a jury, the trial court apparently alluded to Old Republic's trial brief. In our view, nothing in this brief amounts to consent to a bench trial on the issue of waiver. We recognize that the brief argues at one point that the trial court could resolve the issue of waiver as a matter of law. However, this argument was predicated on Old Republic's contention that it was *undisputed* that (1) its March 1991 waiver was limited to a specific settlement proposal and (2) the settlement proposal was never consummated. As we have explained, waiver is a question of law only when the underlying facts are undisputed, and these facts were hotly contested during the bench trial.

and altered its litigation strategy or position as a result was not addressed. We thus discern no substantial evidence supporting a finding of detrimental reliance by FSR, an essential predicate of estoppel.

Denial of a jury trial in these circumstances is reversible error per se (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 447, pp. 493-494), and there is otherwise a failure of evidence to support the trial court's rulings in the bench trial. The trial court's remarks following the bench trial, together with the judgment, indicate that the sole claim that Old Republic was permitted to pursue against FSR following the ruling in the bench trial was its claims predicated on the theory that FSR used false invoices to obtain insurance proceeds. We therefore conclude that the judgment must be reversed on the other claims against FSR in Old Republic's second amended complaint.

## II

Old Republic raises numerous contentions of error regarding the jury trial on FSR's bad faith claim. However, Old Republic's principal contention is that the bad faith claim, as litigated, fails as a matter of law. For reasons that we explain below, our resolution of this contention is dispositive of the issues before us, and therefore we do not address Old Republic's other contentions.

### A.  *Relevant Facts*

Old Republic's second amended complaint contains claims against FSR for fraud, breach of contract, and bad faith predicated on the following allegations: "On numerous occasions during the [Busch, Forgy, and Gold, Marks actions], Old Republic questioned FSR regarding the status of Cannizzaro as an employee or independent contractor of FSR for the purpose of determining whether coverage was afforded to Cannizzaro under the Old Republic policy. [¶] . . . FSR intentionally failed to disclose to Old Republic Cannizzaro's status as an independent contractor, with full knowledge that Cannizzaro was, in fact, an independent contractor during the time period in question. [¶] . . . FSR intentionally failed to disclose Cannizzaro's true status as an independent contractor in order to ensure that Old Republic would pay the defense and settlement costs in the Busch, Forgy, and Gold, Marks actions." Old Republic sought recovery of settlement and defense costs paid out in these actions, an accounting of these costs, and its legal and investigation fees.

At the beginning of the second jury trial on FSR's claims against Old Republic, FSR announced that it would pursue a single claim of bad faith,

based on the theory that the fraud claim in Old Republic's second amended complaint was an act of bad faith. Old Republic objected that this claim was barred by the absolute privilege in Civil Code section 47, and it was an improper claim of malicious prosecution.

At trial, Fred Sands testified that FSR and Old Republic had had a good relationship, that FSR discontinued the relationship because Old Republic was "charging [FSR] a lot of money for very little coverage," and that he believed that Old Republic had sued FSR in retaliation for the discontinuance, although no one from Old Republic had ever indicated this to him. Sands and Mark Loeterman, an in-house attorney for FSR, testified that FSR's sales agents, including Cannizzaro, were independent contractors, and that FSR had identified their sales agents as such in their applications for insurance from Old Republic. FSR's in-house attorneys denied indicating to Old Republic that Cannizzaro might be an employee. FSR also submitted evidence that Old Republic had obtained summary judgment against Cannizzaro on the theory that Cannizzaro was an independent contractor, and had submitted pleadings alleging that FSR had "unequivocally stated" that its sales agents were independent contractors.

Old Republic's witnesses presented a different view of FSR's representations. Elie testified that, despite inquiries, as of the settlement in the Busch action in June 1991, no one at FSR had unequivocally told Old Republic that Cannizzaro was an independent contractor. Perry testified that he authorized the settlement in the Busch action because there was conflicting information in the file about Cannizzaro's status and therefore Old Republic had to act as if there was coverage.

A central point of conflict was a meeting between Armstrong, Robert Shulkin (an in-house attorney for FSR), and Elie in August 1989. Elie testified that the meeting was convened to clarify Cannizzaro's status, but Armstrong and FSR's counsel declined to resolve this issue unless it would not affect coverage. By contrast, Armstrong denied that he had refused to answer questions about Cannizzaro's status, and Shulkin testified that he could not remember what was said.

Perry testified that he authorized a suit against FSR because he came to the conclusion, based on information in his file, that FSR had deliberately misled Old Republic during the Busch litigation about Cannizzaro's status. Karen Stuckey, an attorney who assisted in preparing Old Republic's second amended complaint, testified that the pertinent allegations in this cross-complaint and the declaration that she had filed in support of the cross-complaint were based on FSR's failure to confirm Cannizzaro's status until

Fred Sands testified on the matter in a deposition in July 1993. She also testified the reference to FSR's "unequivocal[]" description of its sales agents as independent contractors in Old Republic's motion for summary judgment against Cannizzaro was a report of FSR's statements in its applications for insurance, which did not specifically mention Cannizzaro.

Both FSR and Old Republic presented expert testimony on bad faith and fraud. The jury was instructed that Old Republic's second amended cross-complaint, including the pertinent fraud claim, was dismissed before the jury trial began. In addition, it was instructed on the elements of fraud and intentional misrepresentation. With respect to bad faith, the jury was instructed, inter alia, that "[b]efore an insurance company sues its insured for fraud, the insurance company owes a duty of good faith and fair dealing to the insured to reasonably and carefully investigate both the facts and the law to determine that it has proper grounds, and reasonable cause, to file the lawsuit, and also that it has proper grounds, and reasonable cause, to charge the insured with fraud."

### B.  *Bad Faith Litigation*

▮       The key issue presented here is whether an insured may state a bad faith claim against its insurer for initiating litigation against the insured when the insured does not contend that the insurer acted unreasonably in investigating or paying the underlying insurance claim. At trial, FSR did not contend, and did not introduce evidence, that Old Republic conducted an unreasonable investigation of FSR's underlying claims for policy benefits or failed to make full and timely payment of these benefits. The trial focused entirely on whether FSR had properly clarified Cannizzaro's status while Old Republic was investigating FSR's claims, and on whether Old Republic had acted reasonably in deciding to sue FSR for fraud in 1994, after FSR's claims for policy benefits had been investigated and paid. On appeal, FSR concedes that prior to the second jury trial it voluntarily abandoned all of its claims against Old Republic, apart from its bad faith claim predicated on the fraud allegations in Old Republic's second amended complaint.

Our analysis of this issue begins with fundamental principles concerning insurance bad faith.  ▮   " 'Every contract imposes on each party a duty of good faith and fair dealing in each performance and in its enforcement.' [Citations.] Simply stated, the burden imposed is ' "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." ' [Citations.] Or, to put it another way, the 'implied covenant imposes upon each party the obligation to do everything that the contract

presupposes they will do to accomplish its purposes.' [Citation.] This rule was developed 'in the contract arena and is aimed at making effective the agreement's promises.' [Citation.] The 'precise nature and extent of the duty imposed . . . will depend on the contractual purposes.' [Citation.]" (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1393 [272 Cal.Rptr. 387], fn. omitted.)

█ Generally, "[c]ontract law exists to enforce legally binding agreements," whereas "tort law is designed to vindicate social policy," and thus "[c]onduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514, 515 [28 Cal.Rptr.2d 475, 869 P.2d 454].) However, an exception to these general principles "has developed in the context of insurance contracts," and "for a variety of policy reasons, courts have held that breach of the implied covenant [of good faith and fair dealing] will provide the basis for an action in tort." (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 684, 690 [254 Cal.Rptr. 211, 765 P.2d 373].)

In *Agricultural Ins. Co. v. Superior Court* (1999) 70 Cal.App.4th 385, 397 [82 Cal.Rptr.2d 594], the court summarized the policy reasons supporting recovery in tort from an insurer for breaches of the implied covenant: "An insured seeks peace of mind and economic protection against calamity, the insurer provides that protection for a fee. . . . Insurers occupy the ' " 'status as purveyors of a vital service labeled quasi-public in nature.' " ' [Citation.] Thus an insurer's obligations can include a duty to place the interests of the insured on at least an equal footing with its own interests, because the ' " 'obligations of good faith and fair dealing encompass qualities of decency and humanity' " ' similar to the responsibilities of a fiduciary. [Citation.] Insurance contracts are usually adhesive in nature, since their terms are generally contained in form language dictated by the insurer. . . . '[T]he insured cannot turn to the marketplace to find another insurance company willing to pay for the loss already incurred.' [Citation.] An insurer's breach can therefore frustrate the core purpose of insurance (protecting the insured from calamity) and leave the insured exposed to a disaster it has paid to avoid."

These policy considerations have shaped the development of the bad faith tort in two important ways. First, because tort recovery for breaches of the implied covenant protects the insured's interests in securing an insurance policy, the scope of the implied covenant is tied to the express terms of the policy. When policy benefits were *never* due to the insured, California courts

have generally held that the insured may not assert a bad faith claim. Thus, in *Waller v. Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th 1, a third party insurance bad faith case, our Supreme Court held that when an insurer properly concludes that it has no duty to defend its insured under the policy and denies benefits on that basis, the insured may not assert a claim for bad faith, reasoning that "the covenant [of good faith and fair dealing] is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement. [Citation.]" (*Id.* at p. 36.)

In reaching this conclusion, the *Waller* court favorably cited *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136 [271 Cal.Rptr. 246], a first party insurance bad faith case. In *Love*, the insureds made untimely claims for policy benefits, and the court in *Love* concluded that the insureds' bad faith claim failed as a matter of law because no benefits due under the policy had been withheld. (*Id.* at pp. 1151-1152.) In so concluding, the *Love* court stated: "[W]hen benefits are due an insured, delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because it frustrates the insured's *primary* right to receive the benefits of his contract—i.e., prompt compensation for losses. Absent that primary right, however, the *auxiliary* implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings." (*Id.* at p. 1153, original italics.)

■ Second, in some circumstances the implied covenant continues to protect the insured's interests in the policy after litigation has begun between the insured and the insurer, despite the absolute litigation privilege found in Civil Code section 47.[4] As our Supreme Court explained in *Silberg v. Anderson* (1990) 50 Cal.3d 205, 213, 216 [266 Cal.Rptr. 638, 786 P.2d 365], the principal purpose of this privilege "is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions," and "[t]he only exception" to its application "to tort suits has been for malicious prosecution actions. [Citations.]"

In *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870 [221 Cal.Rptr. 509, 710 P.2d 309], the court clarified that this privilege does not shield all postlitigation conduct by an insurer. In *White*, the insureds demanded payment of benefits under their policy, and the insurer denied this claim. (*Id.* at

---

[4]Civil Code section 47 provides that "[a] privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any . . . (2) judicial proceeding . . . ."

pp. 878-879.) After the insureds sued the insurer for breach of contract and bad faith, the insurer made low settlement offers during the litigation, and the trial court permitted evidence of these offers and other postlitigation conduct to be admitted as evidence of the insurer's bad faith. (*Id.* at p. 879.) On appeal, the insurer contended that the settlement offers were absolutely privileged under Civil Code section 47. (*White v. Western Title Ins. Co., supra,* at p. 887.) The court in *White* affirmed the admission of the settlement offers as evidence that the insurer was not evaluating the insureds' claim fairly and in good faith, reasoning that "even if liability cannot be founded upon a judicial communication, it can be proved by such a communication," and that a "careful distinction" must be drawn "between a cause of action based squarely on a privileged communication . . . , and one based upon an underlying course of conduct evidenced by the communication." (*Id.* at p. 888.)

Subsequently, the courts have limited the application of *White.* In *California Physicians' Service v. Superior Court* (1992) 9 Cal.App.4th 1321, 1330 and footnote 7 [12 Cal.Rptr.2d 95], the court held that Civil Code section 47 precluded the insured's bad faith claim resting solely on the insurer's defensive pleadings. Other courts have concluded that in some circumstances an insurer's defensive pleadings are not admissible as evidence of bad faith (*Nies v. National Auto. & Casualty Ins. Co.* (1988) 199 Cal.App.3d 1192, 1200-1203 [245 Cal.Rptr. 518]), and that a claim for bad faith cannot be based on an insurer's appeal from an adverse judgment (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1766, 1770-1772 [31 Cal.Rptr.2d 224]).

■■■ No case has addressed the scope of the implied covenant when, as here, an insurer sues its insured after properly paying all benefits due under the policy. However, we find some guidance in *New Plumbing Contractors, Inc. v. Nationwide Mutual Ins. Co.* (1992) 7 Cal.App.4th 1088 [9 Cal.Rptr.2d 469]. In *New Plumbing,* an employer alleged that one of its employees was injured by a negligent third party, and its workers' compensation carrier had then fully paid the employee's claim. (*Id.* at p. 1092.) The employer alleged that the carrier then engaged in bad faith conduct by failing to pursue its subrogation rights vigorously to recover from the negligent third party, depriving the employer of a reduction or refund of future premiums. (*Id.* at pp. 1095-1096.) Citing *Love v. Fire Ins. Exchange, supra,* 221 Cal.App.3d 1136, the court in *New Plumbing* concluded that the employer had failed to state a claim for bad faith, reasoning that nothing the carrier had allegedly done affected the employer's receipt of benefits or touched the quasi-fiduciary aspect of the insurer-insured relationship.

Here, as in *New Plumbing*, FSR raises no dispute about Old Republic's investigation of FSR's claims or its full payment of benefits. Unlike the carrier's alleged postpayment conduct in *New Plumbing*, which indirectly imposed financial injury on the employer, Old Republic's fraud allegations in its second amended complaint were intended to recover some or all of the benefits paid to FSR. Nonetheless, we do not view this difference as dictating an outcome other than that reached in *New Plumbing*. FSR's theory of bad faith rests *squarely* on the allegations in the second amended complaint alone, and under the reasoning in *White* and *California Physicians' Service*, these allegations fall within the protection of the absolute privilege found in Civil Code section 47. Thus FSR, like the employer in *New Plumbing*, has failed to state an actionable cause of action for bad faith.

FSR disagrees for two reasons. Neither is persuasive. First, citing *White v. Western Title Ins. Co., supra,* 40 Cal.3d 870 and other cases, FSR contends that an insured may bring an action for bad faith against its insurer for unreasonably instituting litigation against the insured. However, as we have explained, *White* supports our conclusion, and the remaining relevant cases involve situations, unlike that presented here, in which the insurer engaged in unreasonable conduct *beyond* instituting litigation. (*Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 570 [108 Cal.Rptr. 480, 510 P.2d 1032] [insurer's agent prompts criminal investigation against insured, and then insurer rejects claim because insured refuses to submit to examination under oath pending resolution of criminal investigation]; *Dalrymple v. United Services Auto. Assn.* (1995) 40 Cal.App.4th 497, 514-515 [46 Cal.Rptr.2d 845] [policy benefits not timely paid and effectively delayed by insurer's declaratory relief action]; *Imperial Casualty & Indemnity Co. v. Sogomonian* (1988) 198 Cal.App.3d 169, 185, fn. 16 [243 Cal.Rptr. 639] [in dicta, court observes that delaying payment of benefits by threatening baseless litigation will subject insurer to liability for bad faith]; *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1986) 184 Cal.App.3d 1428, 1431-1434 [229 Cal.Rptr. 409] [insurer fails to negotiate and settle with insured, and then files action for declaratory relief].)

Second, FSR contends that the policy considerations underlying tort recovery for breaches of the implied covenant, including the quasi-fiduciary relationship between insurer and insured, support a bad faith claim in the circumstances presented here. However, the absolute privilege under Civil Code section 47 has been held to bar tort claims alleged against *fiduciaries* based solely on statements that they have made in judicial and quasi-judicial proceedings. (*Harris v. King* (1998) 60 Cal.App.4th 1185, 1187-1188 [70 Cal.Rptr.2d 790] [on demurrer, absolute privilege precludes tort claims

against physician alleged to be plaintiff's fiduciary based on physician's report to workers' compensation carrier]; *Kachig v. Boothe* (1971) 22 Cal.App.3d 626, 640-641 [99 Cal.Rptr. 393] [on demurrer, absolute privilege precludes intentional infliction of distress claim against real estate agents alleged to be plaintiff's fiduciaries based on testimony given at trial].) Furthermore, as we have explained, at least one court has concluded that this privilege bars a bad faith claim predicated solely on the insurer's defensive pleadings, despite the quasi-fiduciary relationship between insurer and insured. (*California Physicians' Service v. Superior Court, supra*, 9 Cal.App.4th at p. 1330 & fn. 7.)

The remaining policy considerations supporting the bad faith tort have greatly reduced weight when, as here, the insured does not dispute that its claim has been fully and promptly paid. In these circumstances, the insured cannot contend that it has been denied the security against losses and third party liability that it purchased under the express terms of the policy, and the only uncertainty the insured faces is whether the insurer is entitled to recover some or all of the policy proceeds in a judicial proceeding. Absent recovery for bad faith, the insured is nonetheless protected from abusive litigation by the cost of litigation against the insured, and by the availability of an action for malicious prosecution and other remedies consistent with the absolute privilege under Civil Code section 47. (See *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 872-873 [254 Cal.Rptr. 336, 765 P.2d 498].) In our view, the diminished considerations underlying the bad faith tort must yield to "the policy of encouraging free access to the courts" which is "so important as to require application of the [Civil Code section 47 absolute] privilege to torts other than defamation. [Citations.]"[5] (*Silberg v. Anderson, supra*, 50 Cal.3d at p. 215.)

In sum, FSR's bad faith claim, as litigated, fails as a matter of law.

---

[5]Moreover, we discern in malicious prosecution a better procedure for resolving whether Old Republic's fraud claim was meritless and improperly motivated than that adopted here to resolve FSR's bad faith claim. To establish a cause of action for malicious prosecution, a plaintiff must demonstrate, inter alia, that the underlying action " 'was brought without probable cause [citations] . . . .' " (*Sheldon Appel Co. v. Albert & Oliker, supra*, 47 Cal.3d at pp. 871-872.) Establishing the lack of probable cause on a set of facts is traditionally "a question of law to be determined by the court, rather than a question of fact for the jury" because it "requires a sensitive evaluation of legal principles and precedents, a task generally beyond the ken of lay jurors . . . ." (*Id.* at p. 875.) Even in bad faith actions based on allegations that an insurer engaged in a pattern of conduct incorporating improper litigation, the courts have recognized that a determination of proper cause for the insurer's litigation is properly assigned to the trial court. (*Dalrymple v. United Services Auto. Assn., supra*, 40 Cal.App.4th at pp. 510-517.)

Here, the trial court made no determination regarding the legal merits of Old Republic's fraud claim, and the entire task of assessing this claim was consigned to the jury. Although we take no position on whether Old Republic had probable cause to bring its claim, the resolution

## DISPOSITION

The judgment is reversed with respect to Old Republic's claims against FSR in its second amended cross-complaint, apart from Old Republic's claims that FSR had submitted false invoices, and the matter is remanded for further proceedings in accordance with this opinion. The judgment is reversed with respect to FSR's claims against Old Republic in its first amended cross-complaint, and the trial court is directed to enter judgment in Old Republic's favor on FSR's cross-complaint. Old Republic is awarded its costs on appeal.

Vogel (C. S.), P. J., and Hastings, J., concurred.

---

of this issue is not obvious on its face, yet FSR's bad faith action incorporated no means for addressing it.