Filed 9/30/16  Gault v. Sass Electric CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MICHAEL GAULT et al., | D069107 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2012-00096451-CU-BC-CTL) |
| SASS ELECTRIC, INC. et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Affirmed.

Higgs, Fletcher & Mack, John Morris and Rachel E. Moffitt for Plaintiffs and Appellants.

Smaha Law Group, John L. Smaha, John Paul Teague and Gregory J. Borman for Defendants and Respondents.

In 2012, Michael Gault and CGE, Inc. (together Gault) sued Sass Electric, Inc. and Christopher Sass (together Sass) regarding a business dispute.  In April 2013, they resolved their dispute by entering a settlement agreement, which provided several

payment options for Sass to fulfill his monetary obligation to Gault. One of the payment options permitted Sass to satisfy his obligation by paying Gault $386,000 within three years. The settlement agreement also provided that if Sass defaulted under the terms of their agreement, then Gault could seek entry of a stipulated judgment on an ex parte basis. About one year after the settlement agreement was executed, Gault alleged Sass's default, obtained entry of the prior stipulated judgment, and began collection activities. By June 2015, Sass paid Gault a total of $386,000 and moved to compel Gault to acknowledge satisfaction of the stipulated judgment, which the trial court granted.

Gault appeals and argues that the stipulated judgment's principal amount of $692,000 was not satisfied because under the terms of the parties' settlement agreement, Sass could only pay him a lesser amount if he was *not* in default under their settlement agreement. We do not interpret the settlement agreement in the manner Gault urges, and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Prior to April 2012, Sass performed electrical work as a subcontractor for Gault. In the course of their dealings, Gault contributed over $734,000 to Sass to pay for Sass's expenses and allegedly obtained an option to purchase 50 percent of Sass Electric, Inc. (SEI). Sass disputed that Gault acquired an option to purchase any interest in SEI. In April 2012, Gault filed a complaint against Sass regarding their business disputes, and one year of litigation followed.

On April 9, 2013, the parties entered a settlement agreement. Under the agreement, Sass is required to pay Gault a $15,000 "down payment" within 60 days and

2

$65,000 by February 1, 2014 (or earlier, if Sass could sell his two collectible automobiles). The agreement contains the following provisions regarding continuing payments:

> "SEI and Sass, collectively, shall make additional monthly payments to Gault in the following manner:
>
> * $5,000 a month for the first 36 months;
> * $8,000 a month for the next 24 months;
> * $10,000 a month for the next 24 months.
>
> "Payment shall be made on the first day of each month, commencing May 1, 2013 directly to Gault. **If, however, SEI and Sass timely pay Gault $2,500 a month for the first 36 months; $3,500 for the next 24 months; and $4,500 a month for the next 24 months, Gault shall waive the remaining payment amounts. Similarly, if SEI and Sass pay Gault a total of $306,000 (exclusive of the $80,000 noted above) within three years of this Agreement, Gault shall waive the remaining amount owed."** (Emphasis in original.)

The agreement additionally calls for Sass to execute a promissory note to Gault in the amount of $692,000 and to secure the note with a deed of trust on Sass's real property (the Ramona property). The promissory note reiterates the agreement's payment terms, including a provision that "if [Christopher Sass] pays [Michael Gault] a total of $386,000 within three years of this Agreement, [Michael Gault] shall waive the remaining amount owed." The note states that it "evidences a settlement" between the parties and refers to the executed settlement agreement.

3

Further under the settlement agreement, the parties agreed to execute a stipulated judgment attached to the agreement and incorporated by reference into it. The agreement states:

> "The original Stipulated Judgment will be held in trust by Gault, and only filed in the event of Default under this Agreement. Sass and SEI and their counsel agree that Gault shall be entitled to submit an *ex parte* application to the Court requesting the Court re-open the case, enter the Stipulated Judgment if a Default has occurred, and include in the Stipulated Judgment the attorneys' fees and costs associated with entering the Stipulated Judgment."

"Default" is separately defined in the settlement agreement to include "any failure by Sass or SEI to timely pay settlement funds when due or breach of any other obligation created by this Agreement" and "any failure to comply with this Agreement[.]" The stipulated judgment, which by its terms references the parties' "attached" settlement agreement, shows "$692,000" typed in as the principal amount and blank lines where deductions could be made for payments, or additions for attorney fees, to arrive at the total judgment amount.

On April 15, 2013, Christopher Sass recorded a quitclaim deed for the Ramona property to his mother without Gault's knowledge, and that same day, also executed and mailed a deed of trust for the Ramona property to Gault. Two days later, Gault recorded the deed of trust.

In February 2014, Gault discovered his flawed security interest in the Ramona property and sent a notice of default to Sass. Sass did not respond or take curative actions within the settlement agreement's prescribed time to do so.

4

In March 2014, Gault filed an ex parte request for entry of the stipulated judgment in the amount of $692,000 less payments made, which Sass opposed.[1] The court entered the stipulated judgment in the amount of $592,000, representing $692,000 less $107,500 for payments already made plus $7,500 in attorney fees relating to filing the ex parte request. Subsequently, Gault began collection activities, including a judgment debtor's examination.

In June 2015, Sass filed a motion to compel acknowledgment of satisfaction of judgment and for entry of satisfaction of judgment. His motion was based on the fact that he had by then paid Gault a total of $386,000, plus additional amounts for attorney fees and interest. Christopher Sass submitted a supporting declaration regarding his understanding that the settlement agreement permitted him to satisfy the stipulated judgment by paying Gault $386,000 before April 2016.

In opposition, Gault acknowledged that the settlement agreement contains various payment options/incentives but argued that Sass's ability to pay less than $692,000 to satisfy his debt was expressly conditioned on him "not defaulting." According to Gault, entry of the stipulated judgment extinguished Sass's rights under the settlement agreement as a matter of law and contract interpretation. Michael Gault's supporting declaration states his intent for the default provision to act as an "acceleration clause," divesting Sass of the "lesser payment" benefit.

---

[1] By this time, Christopher Sass once again held title to the Ramona property.

The trial court disagreed with Gault, discussing that his interpretation of the agreement "would have the effect of either excising the key contract language entirely, or adding language to it which was not expressed by the parties at the time of contracting." The court entered Sass's satisfaction of judgment, and Gault timely appealed.

DISCUSSION

I

*THE MERGER DOCTRINE DOES NOT APPLY IN THIS CASE*

Gault first argues that under the doctrine of merger, the court's entry of a stipulated judgment operated as a matter of law to extinguish Sass's contractual rights. Gault cites *Chelios v. Kaye* (1990) 219 Cal.App.3d 75, and other cases supporting the proposition that when a plaintiff obtains a judgment on a breach of contract claim, the parties' underlying rights and duties on the contract are extinguished and they may not relitigate the same or subsumed claims.

"The doctrine of merger is an aspect of res judicata. [Citation.] 'Under that aspect a claim presented and reduced to judgment merges with the judgment and is thereby superseded.' " (*Diamond Heights Village Association, Inc. v. Financial Freedom Senior Funding Corp.* (2011) 196 Cal.App.4th 290, 301.) The merger doctrine developed to bar subsequent litigation to enforce an extinguished or "merged" contract right. (See 40A Cal.Jur.3d (Aug. 2016) Judgments, § 193 [nature and effect of merger]; see also *Tomaselli v. Transamerica Insurance Co.* (1994) 25 Cal.App.4th 1766, 1770 [after obtaining judgment on breach of contract claim, the plaintiff's rights are governed by the

6

rights on the judgment rather than by any rights that might have arisen from the contract].)

The legal doctrines of merger and res judicata do not necessarily apply when judgments are entered by consent or stipulation. A "consent judgment is not usually given preclusive effect in subsequent litigation on a different cause of action, unless the parties manifest an intent in the consent judgment to give it such preclusive effect." *Landeros v. Pankey* (1995) 39 Cal.App.4th 1167, 1172 [discussing that parties to a consent judgment may not have actually litigated any disputed issues].) "A prior stipulated or consent judgment is subject to construction as to the parties' intent, and if sufficiently ambiguous may be interpreted in light of extrinsic evidence." (*Ibid.*)

We are not persuaded that the doctrine of merger applies in this case. Sass is not seeking to enforce a previously adjudicated claim or right; rather, he argues he satisfied the judgment against him due to the terms of the parties' settlement agreement. None of the cases cited by Gault present a similar factual scenario, where the parties agree in advance to entry of a stipulated judgment if the debtor defaults, the stipulated judgment explicitly references an "attached" settlement agreement containing various payment terms, and the terms require construction based on the parties' intent. (See *Roden v. Bergen Brunswig Corp.* (2003) 107 Cal.App.4th 620, 624 [" ' "[A] stipulation or consent judgment, being regarded as a contract between the parties, must be construed as any other contract." ' "].)

7

## II

*THE PARTIES AGREED TO THREE ALTERNATIVE PAYMENT OPTIONS*

Gault next argues the trial court did not reasonably interpret the settlement agreement, contending that, under the contract, Sass's payment options were expressly conditioned on Sass "not defaulting" and if Sass defaulted and Gault chose to enter the stipulated judgment, then Sass relinquished his right to pay a total of $386,000 within three years (the early payment option). Gault points to the fact that the stipulated judgment shows a principal amount of $692,000, less payments made, on its face and urges that any other interpretation would render a default without consequence.

Sass responds that his early payment option remained effective after entry of the stipulated judgment. He contends that the stipulated judgment must be interpreted together with the settlement agreement's terms regarding payments, the stipulated judgment acted as a form of security to ensure payment, and there is no language regarding waiver or extinguishment of his early payment option upon default and entry of judgment. He indicates that Sass could improperly nullify the early payment option if any other interpretation was adopted.

The parties disagree on the proper standard of review. The only conflicting evidence in the record is the parties' declarations discussing each individual's subjective understanding and intention pertaining to the payment provisions, but "evidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166, fn. 3.) Because

8

there is no conflict in competent extrinsic evidence, we independently construe the settlement agreement and stipulated judgment.  (*Ibid.*)

" 'The purpose of the law of contracts is to protect the reasonable expectations of the parties.' "  (*ASP Properties Group v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1268 (*ASP Properties*).)  " ' "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation.  (Civ. Code, § 1636.)  Such intent is to be inferred, if possible, solely from the written provisions of the contract.  (*Id.,* § 1639.)  The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.,* § 1644), controls judicial interpretation.  (*Id.,* § 1638.)"  [Citations.]'  [Citation.]  'The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.'  (Civ. Code, § 1641.)  'The factual context in which an agreement was reached is also relevant to establish its meaning unless the words themselves are susceptible to only one interpretation.' "  (*Canaan Taiwanese Christian Church v. All World Mission Ministries* (2012) 211 Cal.App.4th 1115, 1124.)  Courts must avoid an interpretation that will make a contract extraordinary, harsh, unjust, or inequitable.  (*ASP Properties, supra,* at p. 1269.)

The question of interpretation before us is whether Sass could use the early payment option to satisfy the stipulated judgment.  We conclude he could.

First, at the time the contract was formed, the parties' mutual intent was to provide Sass with sufficient motivation to completely fulfill his monetary obligation to Gault by

9

2016 instead of 2020. The parties understood that Sass did not have the current or immediate ability to fully pay Gault.[2] Under the settlement agreement, the first and second payment options contemplated set monthly payments by Sass until May 2020, and the third payment option does not set a monthly schedule but required total payments of $386,000 by April 9, 2016.

Second, the settlement agreement does not state that Sass's early payment option is extinguished, void, or otherwise waived upon default and entry of stipulated judgment, while the agreement is detailed on many other points. Gault argues that Sass's ability to pay a less than face amount was "expressly conditioned" on Sass not being in default, but we do not perceive any language conditioning the early payment option on whether or not Sass is in default. Instead, it is most naturally read as a means for Sass to completely satisfy his obligation even if he missed or delayed some monthly payments. Otherwise, Sass could arguably "default" under the contract merely by exercising his third payment option (i.e., intend to pay $386,000 by April 2016 and not make strict monthly payments beforehand), thereby rendering the option meaningless.

Third, the promissory note and stipulated judgment evidenced Sass's monetary obligation to Gault and were intended to facilitate collection efforts, but they were not intended to alter the surrounding terms and amount of Sass's obligation. The promissory note essentially duplicates the settlement agreement's payment terms. The stipulated judgment references an "attached" settlement agreement for its genesis and does not by

---

[2] For example, the parties contemplated payments over years and the timing of one payment under the settlement agreement depended on Sass's ability to sell illiquid assets.

10

its terms extinguish the settlement or any other agreements the parties may have entered into.

Based on the foregoing, a default under the settlement agreement did not extinguish Sass's ability to use his early payment option. The parties could and did agree in advance that Gault would waive the balance due him above $386,000 if Sass made payments of $386,000 within a three-year period. Our interpretation protects the parties' reasonable expectations since if Sass defaulted in year *four* after the agreement's signing, then he would have lost the early payment right.

In summary, Sass's payments to Gault of $386,000 within three years of the settlement agreement satisfied the stipulated judgment, and the trial court properly required Gault to acknowledge satisfaction of judgment.

## DISPOSITION

The order compelling Gault to acknowledge satisfaction of judgment and entering satisfaction of judgment is affirmed. Sass is entitled to costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

HALLER, J.

O'ROURKE, J.

11